## KINGSFORD CHEMICAL COMPANY *v.* CITY OF KINGSFORD.

1. TAXATION—STATE TAX COMMISSION—PRESUMPTIONS.

   It will be presumed that the State tax commission performs its duties honestly and to the best of its judgment.

2. SAME—FRAUD—BURDEN OF PROOF.

   The burden is upon a plaintiff taxpayer, who is seeking to recover taxes paid under protest, to establish fraud.

3. SAME—FRAUD—INFERENCES.

   Fraud in the assessment of taxes cannot be inferred from a mere difference in opinion.

4. SAME—PROPERTY—STATE TAX COMMISSION.

   The final arbiter of the value of property for taxing purposes is the State tax commission when it has jurisdiction.

5. SAME—STATE TAX COMMISSION—COURTS.

   Courts are slow to interpose their judgment to say that an assessment for taxes, made by the State tax commission, has transgressed reasonable limits.

6. SAME—FRAUD—RELIEF—EVIDENCE.

   The intentional overassessment of property for taxation purposes is fraud and equity has jurisdiction to relieve the burden of such oppression, but the evidence must clearly show intentional violation of duty or disregard of the taxpayer's rights.

7. SAME—ASSESSMENTS—CASH VALUE.

   Assessments on property for purposes of taxation should be at its cash value and the assessor should consider all the advantages and disadvantages of the location, condition and quality of the soil, waterpower, proximity to market and other privileges (Const 1908, art 10, § 7; CL 1948, § 211.24, as amended by PA 1949, No 285).

---

REFERENCES FOR POINTS IN HEADNOTES

[1–3, 11] 51 Am Jur, Taxation § 1252.
[4, 5] 51 Am Jur, Taxation § 770.
[6, 12, 13] 51 Am Jur, Taxation § 771.
[7] 51 Am Jur, Taxation §§ 696, 701.
[9] 51 Am Jur, Taxation §§ 696, 701, 727.
[13] 51 Am Jur, Taxation § 659.
[14] 51 Am Jur, Taxation § 767 *et seq.*
[15] 20 Am Jur, Judgment § 60; 53 Am Jur, Trial § 332 *et seq.*
[16] 53 Am Jur, Trial § 824.
[17] 51 Am Jur, Taxation §§ 698, 703–705.
[18] 51 Am Jur, Taxation § 722 *et seq.*

8. SAME—EVIDENCE—INSURANCE.

Testimony of president of purchaser of manufacturing plant that buildings were insured for $9,000,000, allegedly needed to secure coinsurance, and that such amount was based on reproduction cost less depreciation, was properly admitted into evidence in such purchaser's action to recover taxes paid under protest, as bearing upon good faith of State tax commission in making final assessment.

9. SAME—CASH VALUE—SINGLE SALE.

A single sale is not sufficient to establish the usual selling price of property for purposes of determining the true cash value, where there is no other property like it in the vicinity and sales are too infrequent to establish market value (Const 1908, art 10, § 7; CL 1948, § 211.24, as amended by PA 1949, No 285).

10. SAME—ASSESSMENT—VALUE.

Verdict rendered in taxpayer's action to recover taxes paid under protest on manufacturing plant it had recently purchased for less than assessed value *held,* not to have been against the great weight of the evidence.

11. SAME—ASSESSMENT—FRAUD.

Plaintiff taxpayer who had recently purchased a manufacturing plant, in part for speculative purposes, *held,* not to have sustained its burden of proof that the assessment made thereon by the State tax commission was so excessive as to be fraudulent (Const 1908, art 10, § 7; CL 1948, § 211.24, as amended by PA 1949, No 285).

12. SAME—ASSESSMENT—ARBITRARINESS—UNIFORMITY.

Record in taxpayer's action to recover taxes paid under protest on manufacturing plant it had recently purchased *held,* to have failed to disclose that there was arbitrariness or lack of uniformity in methods used by State tax commission in determining equalization in the city and county where the plant was located or in arriving at the tax on plaintiff's property.

13. SAME—ARBITRARINESS—ASSESSMENT—CASH VALUE—ADDITION.

Claim that addition of 10% to cash value, as found by the State tax commission, was arbitrary *held,* not sustained, where the same percentage was also added to the cash value of all other properties in the city where the property was located.

14. APPEAL AND ERROR—MISCARRIAGE OF JUSTICE.

Verdict and judgment for defendant city in action by plaintiff taxpayer which had recently bought a manufacturing plant located there and paid taxes thereon under protest will not

be set aside for claimed errors by trial court in denying plaintiff the right to bring into court other taxpayers in order to show their assessments were at a lower ratio than plaintiff's, in refusing to allow plaintiff's president to show what facts were before the State tax commission when it made its decision, in allowing proofs of assessments made for 3 preceding years when property had been owned by prior owner, in denying plaintiff's motion for judgment notwithstanding verdict, in erroneously instructing jury and in denying plaintiff the right to show operational losses for 2 years after plaintiff acquired the plant, where none of the claimed errors has resulted in a miscarriage of justice (CL 1948, § 650.28).

15. SAME—JUDGMENT NOTWITHSTANDING VERDICT—DIRECTED VERDICT.

It was not error for trial court to deny plaintiff's motion for judgment notwithstanding verdict, where it had not, but defendant city had, moved for a directed verdict, the motion was reserved and jury rendered verdict for defendant (CL 1948, §§ 650.28, 691.691).

16. SAME—INSTRUCTIONS—OBJECTIONS.

Plaintiff's complaint that jury in action to recover taxes paid under protest had not been properly instructed *held,* not to have shown reversible error, where instructions given were complete, fair and clear, plaintiff did not object to any given nor call court's attention to a failure to instruct on any important phase of the case (CL 1948, § 650.28).

17. TAXATION—OPERATING LOSSES—EVIDENCE.

The denial by the trial court of the right to show an operating loss for the first year after plaintiff purchased manufacturing plant did not constitute reversible error in plaintiff's action to recover taxes paid under protest, where plaintiff was permitted to show its operating loss for the second year of operation but court stated it was in error in so doing (CL 1948, § 650.28).

18. SAME—ASSESSMENT—ARBITRARINESS—EVIDENCE.

Plaintiff in action to recover taxes paid under protest on manufacturing plant it had recently acquired *held,* to have failed to establish by a preponderance or greater weight of the evidence to the satisfaction of the jury that the State tax commission either fraudulently and arbitrarily assessed the tax or used wrong principles in so assessing.

Appeal from Dickinson; Jackson (Glenn W.), J., presiding. Submitted June 6, 1956. (Docket No. 10, Calendar No. 46,671.) Decided October 1, 1956. Rehearing denied December 4, 1956.

Assumpsit by Kingsford Chemical Company, a Delaware corporation, against the City of Kingsford, a municipal corporation, to recover sums paid for taxes claimed to be excessive. Verdict and judgment for defendant. Plaintiff appeals. Affirmed.

*Paul Rahm,* for plaintiff.

*Howard Vielmetti* (*John G. Dunn,* of counsel), for defendant.

KELLY, J. Plaintiff seeks the recovery of $36,-515.62, city taxes paid under protest to the defendant city. Plaintiff claims in this action of assumpsit that it was intentionally overassessed and discriminated against and that its properties were assessed at a higher rate than other properties upon the assessment rolls. A jury rejected plaintiff's claim, and motion for judgment notwithstanding the verdict and motion for new trial were denied. Plaintiff appeals.

In 1951 Ford Motor Company abandoned further operations of its Kingsford plant, and on December 17th of that year it sold the plant in its entirety to the plaintiff for $2,338,000.

Almost immediately after purchase of the property from Ford, plaintiff requested a tax adjustment, as is evidenced by the following testimony of Owen Pyle, president and general manager of plaintiff company:

"I would guess that the total land area purchased from Ford Motor Company comprises about half of the total area of the city of Kingsford. We

bought this property on December 17, 1951, and about the first thing we did was to come down and talk to the city officials about the tax situation. * * * I made the suggestion, which was carried out, that the city officials of Kingsford request the State tax commission to come in in an advisory capacity to assist us in determining the fair valuation. * * * They did meet with the city and I subsequently had another meeting with the city officials. I think that as a result of that meeting approximately $2,500,000 was cut off of the Kingsford Chemical Company assessed valuation, as compared to the prior year assessment against Ford Motor Company. That was not what we asked for. I asked for a minimum of 50% reduction. I asked for the most reduction the city could possibly give and a minimum of 50%. In view of the assessment in 1951 against Ford Motor Company being approximately $5,500,000 and that we were granted a $2,500,000 reduction, is approximate the 50% reduction we requested as a minimum. I think that was in the latter part of December or January, 1952."

On November 30, 1953, the State tax commission advised the plaintiff that it had determined the assessed value of the property described in plaintiff's appeal, and had separated said property into 36 parts or parcels, giving the description of each part or parcel and the amount assessed to each. This report disclosed that on 31 of the 36 parcels the State tax commission had reduced the city's 1953 assessed valuation from $2,588,700 to $2,230,900— a reduction of $357,800.

Included in the 36 parcels in the commission's report to plaintiff was the main plant on which the commission reduced the city's assessment from $1,-981,000 to $1,875,000, a reduction of $106,000. Assessments were made on the main plant in 1951 and prior thereto in the amount of $3,562,000.

Of the 36 parcels that the State tax commission placed an assessed valuation on, the assessment on only one parcel, namely, the main plant, is challenged in this appeal. Plaintiff challenges the taxes on the property of the main plant in the amount of $35,625, plus a penalty of $890.62, which were paid under protest, and which plaintiff now seeks to recover.

The size of plaintiff's main plant is partially brought into focus with the following facts:

215 acres of land with 36 structures;

The main operating units are: 3 body plants, a sawmill, a steam power house, a wood distillation and carbonization plant;

5,562 lineal feet of pavement;

5,730 feet of 6-foot cyclone fence;

43,250 feet of railroad track;

23,722 feet of water lines;

22,182 feet of sewer lines;

Total floor space of various units comprising main structure of over 1,000,000 square feet;

Estimated reproduction cost $12,802,745.

Plaintiff in this appeal attacks the integrity of the State tax commission, alleging that said assessment against plaintiff was "fraudulent and discriminatory." Plaintiff claims that the trial court erred in denying plaintiff's motion for a new trial because the verdict of the jury was contra to the overwhelming or great weight of the evidence, and, further, that in arriving "at the true cash value of plaintiff's property, for the purpose of assessment, (the State tax commission) added to the cost of property after depreciation, an arbitrary 10%, which 10% was not added to other property in the city of Kingsford, not belonging to plaintiff."

In the case of *Island Mill Lumber Co.* v. *City of Alpena,* 176 Mich 575, the facts established that the assessed valuation of plaintiff's real estate was in-

creased by the State tax commission from $20,000 to $35,000; that the property was worth from $20,000 to $25,000; that the State tax commission raised the total assessed valuation of the city from $6,071,380 to $9,417,245. In finding that such proof was insufficient to show fraud or bad faith, this Court held that it will be presumed that the members of the tax commission honestly and to the best of their judgment performed their official duties; that the burden was on the plaintiff in an action to recover back taxes paid under protest to establish fraud; that fraud cannot be inferred from a mere difference in opinion. In its opinion this Court stated (p 578):

"If their testimony, taken at its strongest, had any probative force to establish fraudulent conduct on the part of the tax commission, it was for the jury to weigh. We must assume that they testified honestly, as they viewed the matter, and gave their best judgment. The assumption of honesty and the exercise of their best judgment obtains also as to the members of the tax commission in the performance of their official duties, and with it goes extensive experience throughout the State in reviewing tax rolls and appraising property for taxation purposes. The burden is upon the plaintiff to prove to the contrary and show fraud."

In *Twenty-two Charlotte, Inc., v. City of Detroit,* 294 Mich 275, 281, 282, this Court said:

"Under the Constitution and laws of this State, the 'final arbiter of value for taxing purposes which, when it has jurisdiction, determines the same finally and conclusively, is the State tax commission.' *Hudson Motor Car Co.* v. *City of Detroit,* 282 Mich 69, 81 (113 ALR 1472). Courts are slow to interpose their judgment to say that the assessment has transgressed reasonable limits. *S. S. Kresge Co.* v. *City of Detroit,* 276 Mich 565 (107 ALR 1258); *Sloman-Polk Co.* v. *City of Detroit,* 261 Mich 689 (87 ALR

1294); *Rowley* v. *Chicago & Northwestern R. Co.,* 293 US 102 (55 S Ct 55, 79 L ed 222). In *Newport Mining Co.* v. *City of Ironwood,* 185 Mich 668, 685, reference was made to the statement of Mr. Justice Holmes in *Chicago, B. & Q. R. Co.* v. *Babcock,* 204 US 585, 598 (27 S Ct 326, 51 L ed 636):

" 'The board was created for the purpose of using its judgment and its knowledge. (Citations omitted.) Within its jurisdiction, except, as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The State has confided those rights to its protection, and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law. Somewhere there must be an end.'

"In *Merrill* v. *Humphrey, Auditor General* (24 Mich 170, 172), Justice COOLEY pointed out that:

" 'The courts cannot sit in judgment upon supposed errors of the assessor, and substitute their own opinions for the conclusions he has drawn, where it is his judgment, and not theirs, to which the subject has been confided by the law.'

"However, the principle is clear that intentional overassessment is fraud, and equity has jurisdiction to relieve the burden of such oppression. *Sloman-Polk Co.* v. *City of Detroit, supra.* The evidence must clearly show intentional violation of duty or disregard of the taxpayer's rights. *Copper Range Co.* v. *Adams Township,* 208 Mich 209."

Among the 36 parcels above described was a hydroelectric plant, sold by plaintiff to the Wisconsin-Michigan Power Company on February 26, 1953, under an agreement that the 1953 taxes were to be prorated, with plaintiff paying 1/6 and the Wisconsin-Michigan Power Company paying 5/6. The sale price of the hydro plant was $1,522,000 on a time contract, and the testimony disclosed that at the time of trial said contract was worth $1,253,000. The city's 1953 assessed valuation of this hydro plant was

$562,000 and the commission reduced this assessment to $322,350. The tax thereon was paid without protest.

The fact that plaintiff purchased the Ford property, not only for its own use but as a speculative venture, is also disclosed by leases the plaintiff entered into with the Perfex Corporation and the Aluminum Specialty Company.

On September 10, 1952, plaintiff leased body plant No 1 to Perfex Corporation at a $40,000 per year rental, with an option clause to purchase for the sum of $350,000. The commission appraised this plant at $179,301, 65% of the original cost.

In August, 1952, plaintiff leased body plant No 3 to the Aluminum Specialty Company at a $30,000 yearly rental, with an option to purchase for the sum of $180,000. The original cost of this plant was $196,198, and the commission appraised the plant at a value of $127,529, which would be 65% of its original cost.

Mr. Pyle, president of plaintiff corporation, testified that the total price paid by plaintiff to the Ford Motor Company was $2,338,000; that subtracting from said amount $302,000, being the amount Kingsford paid to Ford for the Wisconsin property, leaves a total of $2,036,000; that subtracting therefrom the $336,000 paid for personal property, leaves a total of $1,700,000, which would be the amount paid to Ford for the real property located in Dickinson county, Michigan. Mr. Pyle then stated:

"Then I noted the hydroelectric plant sale. Total price received was $1,522,000. The present value of that contract as I testified, at 3.6% interest is $1,253,000. I deducted from that $302,000, which was what we paid Ford Motor Company for the Wisconsin property. That property was sold to the Wisconsin-Michigan Power Company. That left a total of $951,000, which represents the balance of

the hydro plant property located in Michigan. I next deducted that figure from the cost of all the Michigan real estate of $1,700,000, leaving balance of $749,000 for other real estate located in Dickinson county, Michigan."

Witness Pyle did not endeavor to establish clear cash value in any way other than that referred to above, and plaintiff failed to offer in evidence its book value as to its property.

The only witness who offered testimony to establish a different cash value than that arrived at by the commission was the appraiser, Mr. Earl Closser. Closser discounted reproduction cost by 90% and estimated the cash value of the property involved in this suit at $1,250,000. This is in sharp contrast to the value established by the commission, which allowed a maximum depreciation of 90% on some buildings and a minimum of 35% on others, and established a usable value that fluctuated from 10% to 65%.

This was not an easy appraisal to make and it is apparent that there could be substantial difference of opinion between honest men endeavoring to make a fair cash value appraisal. This case involves a single sale of a plant built by Ford in 1924 and which had not been offered for sale until 1951, when purchased by plaintiff. The Ford Motor Company having no further use of the plant insisted that it be sold in its entirety.

Mr. Pyle testified that the Kingsford Chemical Company was organized and purchased the Ford property on December 17, 1951, and that the directors and stockholders of said corporation had many contacts throughout the United States. The purchase was made not only for the corporation's use, but, also, for speculative purposes, as is evidenced by the following testimony of Mr. Pyle:

"It was the intention of the directors and officers of the company, and the stockholders, to utilize the sawmill, chemical plant, distillation plant and steam plant, steam-power plant. That would include also the maintenance building. These men wanted to dispose of the balance of the property."

An examination of the court's charge to the jury discloses that the court fully and properly explained our constitutional and statutory requirement, namely, that assessments shall be on property at its cash value.* The court explained that in determining cash value the assessor should consider all the advantages and disadvantages of the location, condition and quality of the soil, water power, and other privileges or disadvantages attendant with ownership of property.

The court did not restrict plaintiff in its introduction of proof that the plant was so located as to make it difficult to operate in competition with other plants in similar operations because of the cost of railroad transportation of materials necessary for manufacture, and then transportation of the product to market after manufacture. The court allowed plaintiff ample opportunity to relate its own successful efforts to dispose of parts of the plant that it was not using.

In its charge to the jury on the question of insurance on the plant, the court stated:

"Plaintiff's president testified that the buildings on the properties were insured in the sum of $9,000,-000. He further testified it was necessary that the plaintiff carry this amount of insurance in order to secure co-insurance for and upon these properties. And that this amount of insurance was based upon cost of reproduction less depreciation. This is evidence which you may consider as bearing upon the

---

* See Const 1908, art 10, § 7; CL 1948, § 211.24, as amended by PA 1949, No 285 (Stat Ann 1955 Cum Supp § 7.24).—REPORTER.

good faith of the State tax commission and you will give it such weight as you deem it is entitled to receive."

Also, the court in its charge to the jury correctly stated:

"Our Supreme Court has ruled that a single sale is not sufficient to establish the usual selling price where there is no other property like it in the vicinity and sales are too infrequent to establish market value."

In *Cleveland-Cliffs Iron Co.* v. *Township of Republic,* 196 Mich 189, this Court held that determination by tax assessors in good faith of the cash value of a mine will not be disturbed by the courts, although such determined cash value is greatly in excess of the amount realized at a sale of said property. The Court said (p 220):

" 'The usual selling price' at the place where the property is when assessed is manifestly no guide to an assessor in a case where the property is singular in character and is never sold, or sold once in a decade."

In *Twenty-two Charlotte, Inc.,* v. *City of Detroit, supra,* this Court stated (p 283):

"The bargain of the taxpayer is not controlling evidence of the 'usual selling price * * * at private sale.' Where property is singular in character and sales are separated by many years, there is no usual selling price in the sense the expression is used to describe the focus of buyers and sellers of commodities actively exchanged in an open market. Nor did the legislature intend that a single event be conclusive. In the valuation problem the assessing officers had to resolve in the instant case, the test of the 'usual selling price' is merely a guide for determination; under the circumstances before us the definition provides a standard for a hypothetical

or fictitious market. It was the duty of the assessors to consider the factors which motivate buyers and sellers to exchange their interests (*Olson* v. *United States,* 292 US 246 [54 S Ct 704, 78 L ed 1236]), and to exercise their judgment in an honest effort to determine at what point the inertia to trade is overcome."

In *Moran* v. *Grosse Pointe Township,* 317 Mich 248, this Court held that a single sale of property does not determine the true cash value as there may be peculiar and temporary economic conditions that determine a price, especially in the case of highly expensive and valuable property for which there may temporarily be little demand.

The court in its opinion denying the motion for judgment notwithstanding the verdict of the jury and, also, the motion for new trial, correctly concluded that:

"Plaintiff adduced evidence, based upon 2 grounds of valuation:

"1. Being based upon a single sale price to-wit, and a single sale of the hydroelectric plant to the Wisconsin-Michigan Power Company.

"2. Testimony of its expert appraiser, Earl Closser.

"Taking up the first ground, it appears that plaintiff proceeded upon a theory which was fallacious in fact and in law.   *   *   *

"Due to plaintiff's fallacious theory of valuation, based upon single sales and its witness Closser discounting the cost of reproduction by 90%, under the circumstances, the verdict of the jury was not against the preponderance of the evidence, let alone the great weight of the evidence.

"Plaintiff's evidence is not strong enough to impute any fraudulent assessment by the State tax commission, actual or constructive."

The burden of proof is upon the plaintiff to show that the commission fraudulently established a cash

value on plaintiff's main plant. Plaintiff has failed to meet this burden of proof.

We shall now consider the question of discrimination, expressed in plaintiff's brief as follows:

"Plaintiff was singled out and assessed at a higher ratio than a number of other taxpayers and that is discrimination, lack of uniformity, and a fundamentally wrong principle."

The supervisors of Dickinson county at their meeting of April, 1953, by a majority vote, approved the equalization report. Dissenting supervisors appealed to the commission, and as a result the commission conducted, concurrently, its survey to determine proper equalization for the county and the propriety of the assessment placed against plaintiff's main plant. Plaintiff was the only property owner in Dickinson county that appealed the city or county assessment against his or her property.

In conducting its county-wide equalization survey and study, the commission used the following procedure:

(1) Classified the assessment rolls of the various assessing units, thus obtaining not only the total number of parcels of property in the county, but the total number in each classification, such as residences, business, industrial, utilities, et cetera;

(2) Selected at least 10% of the properties in each classification, making such 10% selection so that it would be truly representative of all the properties in such classification;

(3) Made a careful appraisal of the properties so selected (Plaintiff does not even infer that the 10% of properties selected were not representative or that the appraisal was not completely and fairly conducted.);

(4) Determined from the results of the appraisal the ratio of the assessment made by the local assessor

to the amount of appraisal determined by the commission.

The procedure listed above was used in the equalization of property in the city of Kingsford, and that part of the analysis of equalized valuation as it pertained to the city of Kingsford was introduced in evidence as plaintiff's exhibit 16. Plaintiff, in its brief, sets forth the percentage ratio of assessment to appraisal, as follows:

| "Class of Property | % Ratio Assessment to Appraisal |
| --- | --- |
| "Real estate: | |
| Residential improved | 37.55 |
| Residential vacant | 40.14 |
| Business improved | 61.96 |
| Business vacant | 31.51 |
| Cutover | 92.17 |
| Industrial | 41.42 |
| Utilities | 56.67 |
| Utilities (flowage) | . . . . . |
| "Personal property: | |
| Industrial | 35.39 |
| Business | 35.33 |
| Utilities | 51.87 |
| Buildings on leased land | 50.51 |
| Airports | 30.77" |

The commission took the percentage ratio of assessment to appraisal of various pieces of property as listed above, averaged same, and arrived at a percentage of 40.7%, as is disclosed by the following answer of Mr. Markle:

"The commission arrived at the assessed valuation for 1953 by applying the average ratio of assessment of all other property in the city of Kingsford as found by our survey of 40.7%. That is real property."

Using this 40.7%, the commission determined the assessed valuation of plaintiff's plant to be $1,875,-

.000, which was $106,000 less than the assessment placed against the property by the local authorities. . .Plaintiff in its brief calls attention to the fact that the percentage ratio of. assessment to appraisal for residential improved property was 37.55%, business vacant 31.51%, airports 30.77%, and then states "that plaintiff in order not to be discriminated against, was entitled to have the ratio of 30.77% as the basis for its assessment."

Plaintiff does not refer to the fact that the utilities ratio was approximately 11% higher, business improved over 20% higher, buildings on leased lands nearly 10% higher, and cutover property over 50% higher, than the percentage ratio of assessment to appraisal as applied to plaintiff's property. Neither does plaintiff challenge the 40.7% as a mathematically correct average, nor does it charge that the methods used in the city of Kingsford differed from the standard methods used by the commission in equalization and appraisals throughout the State.

Plaintiff cites numerous decisions of this Court dealing with the necessity of a uniform method in assessing property. We agree with the principle set forth in these citations, but disagree with plaintiff and appellant's statement that:

"An examination of the Michigan statute fails to show where the legislature has provided that the State tax commission has a right in assessing real estate to divide the real estate into different groups, to use one ratio for one kind of real estate and another ratio for another kind of real estate. * * * In doing so, in the case at bar, the tax commission has adopted a fundamentally wrong principle and the assessment of plaintiff's property is therefore fraudulent."

The Court finds there was no arbitrary or lack of uniform method used by the commission in determining equalization in the city of Kingsford or Dick-

inson county, and that no arbitrary or lack of uniform method was enlisted in arriving at the ratio of 40.7% as used in determining the tax on plaintiff's property.

Plaintiff contends that the commission in arriving at the true cash value of plaintiff's property, added to the cost of the property, after depreciation, an arbitrary 10%, which 10% was not added to other properties in the city of Kingsford.

In determining the rate of 40.7%, above referred to, the State tax commission did not include the property of plaintiff listed in its appeal. The 40.7% represented the ratio between the assessment made by the local taxing authorities and the true cash value as established by the commission. The record establishes that it was the State-wide policy of the commission in making equalization studies to determine first the true cash value of the property and then add to this value 10%.

The record discloses that the only reference to this 10% item was when Mr. Markle, on direct examination, in explaining the equalization method used on body plant No 1, and after stating that the commission determined on an amount equal to 65% of cost, stated:

"*Q.* Then using 65% of that cost what did you do with the result?

"*A.* To that 10% was added because of 10% being added to the entire State by the State tax commission for the year 1953.

"*Q.* And every taxpayer in the State of Michigan had to pay that—an equalized increase of 10%?

"*A.* Yes, sir.

"*Q.* Have you arrived at a figure now with the addition of that 10%?

"*A.* $197,231."

On cross-examination Markle explained the State-wide policy of adding 10%, which policy is not dis-

puted in this appeal. In regard to the claim that the 10% was added to plaintiff's property and not added to other properties in Kingsford, Markle testified:

"*Q.* Was this 10% added to each specific description in the city of Kingsford?

"*A.* Yes. That is how we arrived at this ratio.

"*Q.* The same applies to the rest of the property other than that of Kingsford Chemical Company?

"*A.* It applies to the entire county of Dickinson."

The fact that the question as to the alleged arbitrary addition of 10% to plaintiff's property was not majored by plaintiff at the trial is shown not only by the scarcity of evidence offered at the trial but, also, from the fact that plaintiff did not request any instruction in this regard from the court. Plaintiff in this appeal now claims that the trial court committed reversible error because, on its own motion, the court did not instruct the jury on this claimed arbitrary 10% addition to plaintiff's property.

The trial court in its opinion commented on the evidence in regard to this 10% addition to plaintiff's property, as follows:

"It is difficult to ascertain exactly what was done with this 10%, as affecting all of the items on the assessment roll. We only have Mr. Markle's testimony, that this 10% was added to all of the properties, other than those of the plaintiff. If this is true, then it was necessary for the representatives of the State tax commission to add the 10% to the values of plaintiff properties as adjusted, according to the elements of depreciation, so as to place them upon the same basis as the remainder of the properties, to which the remaining properties have been so subjected.

"Plaintiff bore the burden of proof. Plaintiff could have called as witnesses the members of the State tax commission and their agents and employees, as

well as the defendant could have called them. The
State tax commission was not a party defendant to
this suit. If this issue of 10% was not clarified, it
was due to plaintiff's failure to have called the neces-
sary witnesses to have cleared up the same."

We agree with the trial court's conclusion in this
regard and cannot agree with plaintiff that the ex-
hibits introduced are sufficient to prove plaintiff's
point by a preponderance of the evidence, especially
in view of Mr. Markle's testimony that the 10% was
added to all properties in Kingsford.

The printed record in this case consists of 468
pages. Plaintiff, in its brief, lists 17 reasons for
reversal. These 17 reasons can be consolidated into
the following:

(1) The court committed error in denying plain-
tiff the right to bring into court individuals and all
taxpayers of the city of Kingsford to show, by an
examination of what they paid for their property
and the 1953 assessment roll, that their assessments
were below 40.7% ;

(2) The court erred in refusing to allow plain-
tiff's president, Mr. Pyle, to testify in regard to the
facts he brought before the commission, in an en-
deavor to show what facts were before the commis-
sion when it made its decision;

(3) The court erred in allowing proof of assess-
ments of the property during years 1949, 1950 and
1951, when the property was owned by the Ford Mo-
tor Company;

(4) The court erred in denying plaintiff's motion
for judgment notwithstanding verdict;

(5) The court erroneously instructed the jury;

(6) The court erred in denying plaintiff the right
to show operational losses during the years 1952 and
1953.

CL 1948, § 650.28 (Stat Ann 1943 Rev § 27.2618),
provides:

"No judgment or verdict shall be set aside or reversed, or a new trial be granted by any court in any civil case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."

None of the claimed errors assigned by plaintiff has resulted in a miscarriage of justice. A brief comment, however, will be made in respect to (4), (5) and (6) listed above.

In regard to the claim that the court erred in not sustaining plaintiff's motion for judgment notwithstanding verdict, the court properly answered in its opinion:

"With reference to plaintiff's motion for judgment, notwithstanding the verdict of the jury, plaintiff made no motion for a verdict directed in its favor. Defendant made a motion for a directed verdict in its favor at the close of plaintiff's case and renewed such motion at the close of the entire case. Defendant's motion was reserved under the Empson act.* Inasmuch as the jury rendered a verdict in favor of the defendant, defendant's motion for a directed verdict became moot and the court properly ordered judgment entered for defendant, upon the verdict of the jury."

As to plaintiff's complaint that the jury was not properly instructed, this Court finds that the jury received complete, fair and clear instructions from the court; further, that the plaintiff did not object to any of the instructions, and did not call to the court's attention failure to instruct on any important phase of the case.

---

* CL 1948, § 691.691 (Stat Ann 1955 Cum Supp § 27.1461).—Reporter.

In regard to the court's refusal to allow plaintiff to introduce proof of 1952 operational loss, plaintiff stresses the case of *City of Detroit* v. *Detroit-Canadian Tunnel Co.* (CCA), 92 F2d 833. This case dealt with a tunnel which offered transportation from Canada to Detroit under the Detroit river. The tunnel could not be used for any other purpose and its only value consisted in the revenue that could be obtained by offering such transportation.

In *Twenty-two Charlotte, Inc.,* v. *City of Detroit, supra,* this Court refused to apply the principles of valuation set forth in the *Detroit-Canadian Tunnel Case, supra,* stating (p 285) :

"A generally approved practical scheme of valuation may yet produce fundamentally wrong results under the circumstances of a particular case."

While the court denied the plaintiff the right to show the loss sustained in operating the plant the first year after purchase, *i.e.,* 1952, the court did allow the plaintiff to show the loss for 1953, as is evidenced by the statement of Mr. Pyle that: "For the year ended November 30, 1953, Kingsford Chemical Company had a loss of $400,282." The court stated that it believed that it was in error in allowing the proof of loss in 1953, but that said error was not prejudicial to plaintiff.

The court's refusal to allow proof of loss in 1952 did not constitute reversible error.

Plaintiff could not recover the taxes in this case unless it by a preponderance or greater weight of the evidence established to the satisfaction of the jury that the commission either fraudulently and arbitrarily assessed said tax or used wrong principles in so assessing. This plaintiff failed to do.

Affirmed.

DETHMERS, C. J., and SHARPE, SMITH, EDWARDS, BOYLES, CARR, and BLACK, JJ., concurred.